## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ADAM LABERNIK, and SHANE DOYLE on Behalf of Themselves and All Others Similarly Situated, | **Case No.: 1:24-cv-03058** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| AUGUSTA NATIONAL, INC., | <u>**DEMAND FOR JURY TRIAL**</u> |
| Defendant. | |

Plaintiffs Adam Labernik, and Shane Doyle ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Augusta National, Inc. (the "ANI" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action brought on behalf of all persons who subscribed to https://masters.com/ (the "Website") operated by Defendant.

2.      The Website provides users with access to video content related to The Masters golf tournament, including pre-recorded video clips, interviews, sports analysts, and more.

3.      On the Website, Defendant offers the option for users or site visitors to subscribe to (i) an account with masters.com ("Account Subscribers"); or (ii) the Website's newsletter ("Newsletter Subscribers") (together referred to as "Subscribers").

4.      Account Subscribers. Defendant offers users the option to subscribe by creating an account that provides access to exclusive video content including pre-recorded highlights, news stories, interviews, and video highlights generated based on their selected favorite golfers, along with other golf related video content (see, ¶¶96-99).

5.      Newsletter Subscribers. Defendant offers users the option to subscribe to the Website's newsletter, through which Newsletter Subscribers are given email updates regarding content on the Website in exchange for their contact information. The newsletter email updates include links to the Website, which contains articles and videos (see, ¶¶100-01, 105-06).

6.      Defendant does not disclose on the Website that Subscribers' personally identifying information ("PII") would be captured by the Meta Pixel utilized by Defendant (the "Pixel"), and then shared with Meta, thereby exposing the Subscribers' PII to any person of ordinary technical skill who received that data.

7.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to any service. Congress recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with their video watching.

8.      The Video Privacy Protection Act ("VPPA") prohibits video tape service providers,[1] such as Defendant, from sharing PII. Under the VPPA, PII is information that can specifically tie the identity of an individual to the individual's requested pre-recorded audio video material, either through the title, description, or summary of the video content[2] (the "Video Watching Data").[3]

---

[1] 18 U.S.C. § 2710(a)(4).
[2] 18 U.S.C. § 2710(b)(2)(D)(II).
[3] 18 U.S.C. § 2710.

9.     Congress made clear that the harm to individuals impacted by VPPA violations occurs at the moment, and each time, a Subscriber's information is shared.

10.     Defendant purposefully implemented and utilized the Pixel, which tracks user activity on the Website and discloses that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on a Website without steps taken directly by Defendant or on behalf of Defendant (*e.g.*, by a website manager). The Pixel cannot be placed on the Website by Facebook without the knowledge and cooperation of Defendant.

11.     Defendant does not seek, and has not obtained, consent from users or Subscribers to utilize the Pixel to track, share, and exchange their PII with Facebook.

12.     Subscribers were harmed as a result of Defendant's violations of the VPPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the Pixel from the Website, (ii) add, and obtain, the appropriate consent from Subscribers; or (iii) anonymize video titles in URLs, parameters, and metadata and/or hash subscribers' Facebook user IDs (referred to as "UIDs" or "FIDs") in the Pixel transmissions.

13.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of Subscribers of the Website for violations of the VPPA.

14.     Defendant violated the VPPA the moment, and each time, Plaintiffs and class members requested, obtained, or watched a video on the Website and had their PII shared.

## **PARTIES**

15.     Plaintiff Adam Labernik is a resident of Iowa City, Iowa. In or around the year 2019, Mr. Labernik subscribed to the Website via the Newsletter and Account Section. During

the sign-up process, Mr. Labernik was not offered or asked for consent to share his information as a result of, or through, Defendant's Pixel. Mr. Labernik routinely used the Website to watch pre-recorded video, along with live-video, content and browse articles, since at least 2019. Mr. Labernik also used the search bar to find video content relating to a specific golfer on the Website using a device that was signed into Facebook. Mr. Labernik used the Website as recently as April 2024, resulting in Mr. Labernik's PII and Video Watching Data being shared with Facebook. Mr. Labernik's Facebook profile included personally identifiable information.

16.    Plaintiff Shane Doyle is a resident of Smiths Grove, Kentucky.  In or around the year 2022, Mr. Doyle subscribed to the Website via the Account Section and the Newsletter  During the sign-up process, Mr. Doyle was not offered or asked for consent to share his information as a result of, or through, Defendant's Pixel. Mr. Doyle routinely used the Website to watch pre-recorded video, along with live-video, content and browse articles, since at least 2021. Mr. Doyle also used the search bar to find video content relating to a specific golfer on the Website using a device that was signed into Facebook. Mr. Doyle used the Website as recently as April 2024, resulting in Mr. Doyle PII and Video Watching Data being shared with Facebook. Mr. Doyle's Facebook profile included personally identifiable information.

17.    Defendant Augusta National, Inc. was formed August of 1935 in the state of Georgia and operates a prestigious golf club, an internationally renowned golf tournament ("The Masters"), and controls the media and marketing for those events. ANI is headquartered at 2604 Washington Rd, Augusta, Georgia 30904.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds

$5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

19.     This Court has personal jurisdiction over Defendants because Defendant ANI consents to personal jurisdiction in this Court, as Defendant's Terms of Use state:

> "These Terms of Use shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any principles of conflicts of law. You agree that any action at law or in equity arising out of or relating to these Terms of Use shall be filed, and that venue properly lies, only in state or federal courts located in the borough of Manhattan, New York, New York, and you hereby consent and submit to the personal jurisdiction of such courts for the purposes of litigating any such action."[4]

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant consents to personal jurisdiction in and chose venue in this District through its Terms of Use, as noted above.

## COMMON FACTUAL ALLEGATIONS

### A.     Background of the Video Privacy Protection Act

21.     The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

22.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services

---

[4] *Terms of Use*, MASTERS, https://www.masters.com/en_US/info/terms/index.html (last visited April 21, 2024).

from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

23.     In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

24.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

25.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the

'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[5]

26.    Defendant here is video service providers in that it provided pre-recorded audio-visual materials to Plaintiffs and Class members on their Website.

27.    The relationship between Plaintiffs and Defendant is precisely the type of relationship contemplated by the VPPA.

28.    In this case, Defendant knowingly and systematically disclosed Plaintiffs' personal viewing information to Facebook, without obtaining their consent, by purposely placing the Pixel on the Website with the knowledge it would collect user information.

**B.    <u>How Websites Function</u>**

29.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers, however, websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

30.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[6]

31.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[7]

[5] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on April 21, 2024).
[6] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last April 21, 2024).
[7] *Id.*

32.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[8]

33.     An IP address is "a unique address that identifies a device on the internet or a local network."[9] Essentially, an IP address is:

the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

34.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address. This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[10]

35.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

36.     The Request URL typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of

---

[8]     *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited April 21, 2024).
[9]  *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited April 21, 2024).
[10] *Id.*

parameters. Parameters direct a web server to provide additional context-sensitive services,[11] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[12]*

37.     The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[13]  This is the visible, and usually interactable, website that most people think of.

38.     To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[14]

39.     Such complex tasks include delivering video material to users by requesting video data from network-connected servers and sending that data to be processed and "encoded" by a media player placed in the web browser by web developers, as discussed in Section D(2), *infra*.

## C.     The Masters Golf Tournament

40.     The Masters Tournament is one of the four major championships in men's professional golf.[15] The Masters Tournament is held annually at the Augusta National Golf Club

---

[11] To see examples of how ANI used parameters to provide additional information here, this discussed in Section F(3).
[12] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on April 21, 2024).
[13] *Id.*
[14] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited April 21, 2024).
[15] *Blog: What are the Four PGA Major Golf Tournaments? [Infographic]*, MASTERS, https://collegeofgolf.keiseruniversity.edu/what-are-the-four-pga-major-golf-tournaments/ (last visited April 22, 2024).

in Augusta, Georgia, and take place in early April.[16] The tournament typically features a field of the world's top professional golfers, including past champions, top-ranked players, and qualifiers from various golf tournaments.[17] The field also includes amateur golfers who have earned invitations through their performances in amateur championships.[18]

41.     According to CBS chairman Sean McManus, "the Masters will be the highest-rated golf tournament of the year . . . ."[19] This doesn't shock McManus, "[b]ecause it is every single year."[20]

**D.     Defendant is a Video Tape Service Provider**

42.     Defendant unquestionably tailored its products and services to deliver video. As of 2014, the Website was "live and regularly updated with stories, photos and on-demand video."[21] As of 2016, this included "live scoring, player tracking, groupings, video highlights, in-depth Tournament news coverage and more."[22]

43.     This video is captured through Defendant's partnership with CBS, which has broadcast the Masters event for over 60 years.[23] The coverage of the event has expanded from the

---

[16] *Tournament Info*, MASTERS,   https://www.masters.com/en_US/tournament/index.html   (last visited April 22, 2024).

[17] Paul Sullivan, *Playing the Masters Is by Invitation Only. Here's How Golfers Get One*, THE NEW YORK TIMES (Apr. 13, 2024) https://www.nytimes.com/2024/04/10/sports/golf/masters-tournament-invitation-augusta.html  (last visited April 22, 2024).

[18] *Id.*

[19]  James Colgan, *Inside the Masters' TV ratings plunge: What it means for golf*, GOLF (Apr. 18, 2024) https://golf.com/news/masters-tv-ratings-what-it-means-golf/ (last visited April 22, 2024).

[20] *Id.*

[21]     *Masters     Tournament     TV,     Internet     Coverage     Released*,     MASTERS     (Apr.     3,     2024) https://www.masters.com/en_US/news/articles/2014-04-03/masters_tournament_tv_internet_coverage_released.html (last visited April 22, 2024).

[22] *Digital and Broadcast Coverage Announced for 2016 Masters Tournament,* MASTERS (Mar. 30, 2016) https://www.masters.com/en_US/news/articles/2016-03-30/digital_and_broadcast_coverage_announced_for_2016_masters_tournament.html (last visited April 22, 2024).

[23]   John Steinbreder, CBS Celebrates 60 Innovative Years at the Masters, MASTERS (Apr. 9, 2016) https://www.masters.com/en_US/news/articles/2016-04-09/cbs_celebrates_60_innovative_years_at_the_masters.html (last visited April 22, 2024).

original six-camera coverage broadcast to television to over 75 cameras covering all 18 holes, distributed cross television and "streaming media."[24]

44.     To digitize its Website's offerings, Defendant has partnered with IBM since 1996.[25] Defendant first offered live streaming through its services in 2009 via iPhone app, and has now become the "first sporting event to broadcast a live 4K Ultra High Definition feed . . . available . . . via . . . streaming . . . ."[26]

45.     However, Defendant's partnership with IBM goes further. Defendant works with IBM to create highlight reals for every player (the "Round in Under Three Minutes" feature), a personalized video experience tracking players specific by Website subscribers (the "My Group" feature), and to pick fantasy golf teams (the "My Fantasy" feature), which "serves up a daily AI-generated highlight reel of all the players in your Fantasy Foursome, and you can watch every shot from every player on your team in My Group, so you never miss a shot."[27]

46.     This is accomplished through something Defendant and IBM term the "Hybrid Cloud." Defendant "has been on a journey with IBM building a technology architecture that makes all of their clouds, public or private, act like one."[28]

47.     Once recorded, Defendant uses Veritone's services to "effectively archive and monetize their video rights . . . ."[29] In fact, Veritone serves as "the archive of record and as the

---

[24] John Steinbreder, CBS Celebrates 60 Innovative Years at the Masters, MASTERS (Apr. 9, 2016) https://www.masters.com/en_US/news/articles/2016-04-09/cbs_celebrates_60_innovative_years_at_the_masters.html (last visited April 22, 2024).
[25] Ward Clayton, *IBM and Masters.com Celebrate 20 Years*, MASTERS (Apr. 2, 2016) https://www.masters.com/en_US/news/articles/2016-04-02/ibm_and_masterscom_celebrate_20_years.html?promo=article_next (last visited April 22, 2024).
[26] *Id.*
[27] IBM, *IBM technology at the 2021 Masters*, YOUTUBE https://www.youtube.com/watch?v=LsPQN-_uFtQ (last visited April 22, 2024).
[28] *Id.*
[29] *Press Release: Veritone Extends Partnership with Augusta National, Delivering Brand Exposure and Boosting Archival Revenue*, VERITONE (Mar. 28, 2023) https://www.veritone.com/press-releases/veritone-extends-partnership-with-augusta-national-delivering-brand-exposure-and-boosting-archival-revenue/ (last visited April 22, 2024).

exclusive North American licensing partner for all [ANI] non-live or archival footage across their portfolio of events . . . ."[30]

48.     ANI's archive of assets includes "match broadcast feeds, ISO feeds, course and club scenery, press conferences, official films and more."[31]

49.     ANI makes use of Veritone's "elite suite of best-in-class AI-based technology and licensing services, including Veritone Digital Media Hub (DMH), an asset management and monetization solution that helps content owners generate more revenue from their assets and provides metadata tagging and content management."[32]

50.     ANI uses Veritone's DMH to "ensure footage from ANI's global roster of events is captured, archived and enriched for future use and discovery" and "to enable media delivery, licensing and invoicing of ANI assets to third parties across the core verticals of sports networks, documentary producers, *advertising agencies* and film/TV studios."[33]

51.     The DMH enables "approved third parties to discover and license content from [ANI's] archive, [and as a result,] ANI is provided with incremental brand exposure and an archival revenue stream . . . ."[34]

52.     In short, Defendant was engaged in the business of delivering video, as it developed the technical infrastructure to, made strategic partnerships to, and substantially tailored its Website to deliver pre-recorded video.

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* (emphasis added)
[34] *Id.*

**E.**     **Defendant Utilizes the Facebook Pixel to Gather and Transmit PII and Video Watching Data**

53.     Meta provides various "Business Tools" to web developers to monitor user interactions on their websites, which can then be shared with Facebook. For example, Facebook offers the Facebook Pixel (the "Pixel") and the Facebook Conversions API. Where "the Pixel lets you share web events from a web browser[,] . . . the Conversions API lets you share web events directly from your server."[35]

54.     The purpose of these Business Tools, regardless of which are used, is the same: to gather, collect and then share user information with Facebook for analysis, generating valuable data about users. This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[36]

55.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

56.     ANI chose to make use of the Pixel to monitor and transmit user activity from users' browsers. The Pixel tracks subscriber-activity on web pages by monitoring pre-determined events which, when triggered, cause the Pixel to automatically capture relevant data specified by the website developers, bundle that captured data with Facebook cookies, and send the bundled package of data directly to Facebook via an HTTP "Request" the instant the event is triggered.[37]

57.     Website developers are given access to the data collected through the use of the Pixel via Facebook's Events Manager tool, which allows website developers to review the URLs

---

[35] *Business Help Center: About deduplication for Meta Pixel and Conversions API events*, FACEBOOK, https://www.facebook.com/business/help/823677331451951?id=1205376682832142 (last visited April 21, 2024).
[36] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on April 21, 2024).
[37] *Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited April 21, 2024).

correlated to Pixel activity, the parameters and metadata sent through those Pixel activations, and use that information to improve advertising effectiveness and user engagement.

58.    The owner of a website – here, Defendant – holds the decision-making authority over the placement of the Pixel on its site.  The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business.  The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

1)  **Defendant added the Pixel to the Website**

59.    The Pixel must be added by website developers to a website.

60.    Before gaining access to the Pixel, website developers must agree to Meta's Business Tools Terms, which explicitly clarify for website developers that their use of the Pixel will result in Facebook receiving users' information ". . . that personally identifies [them] . . . " ("Contact Information") and information ". . . about [users] and the actions they take on your websites . . ." ("Event Data").[38] The terms also warn website developers that Facebook will "process the Contact Information solely to match the Contact Information against UIDs. . . as well as to combine those user IDs with corresponding Event Data."[39]

61.    The terms also require Pixel-using web developers to "represent and warrant that [they] have provided robust and sufficiently prominent notice to users regarding the Business

---

[38]    *Meta     Business     Tools     Terms*,     *Section     1(a)(i)-(ii)*,     FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2-VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited April 21, 2024).
[39] *Id.* at Section 2(a)(i)(1).

Tool Data collection, sharing and usage that includes, at a minimum . . . a clear and prominent notice on each web page where [Meta's Pixel is] used that links to a clear explanation (a) that third parties, including Meta, may use cookies, web beacons, and other storage technologies to collect or receive information from [the web developers' websites] . . . and use that information to provide measurement services, [and] target and deliver ads . . . ."[40]

62.    To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[41] For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[42]

63.    To add the Pixel to webpages, website developers must add a snippet of code to their own webpage code that, once loaded onto browsers, results in additional Facebook code being called by the webpage to monitor user activity and events.[43] This action cannot occur by accident.

64.    To accomplish this, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

---

[40] *Id.* at Section 3(c).

[41] *Business Help Center: How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on April 21, 2024).

[42] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (Jun. 14, 2021), SPROUTSOCIAL, https://sproutsocial.com/insights/facebook-business-manager/ (last visited on April 21, 2024).

[43] *The Facebook Pixel: What It Is And How To Use It*, FACEBOOK (FEB. 5, 2021), https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel (last visited April 21, 2024).

65.     Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) installing base code in the header of every webpage the Pixel is active, (ii) setting automatic advanced matching behavior, (iii) adding event code using an automated tool or manually,[44] (iv) domain verification, and (v) configuring web events.[45]

66.     When installing the Pixel, the website developer instructs the Pixel which website events ("Pixel Events") to track (e.g., which items are clicked, which webpages are loaded, the metadata tags of content on the webpage), and the Pixel programming connects with Meta's servers to obtain additional Pixel code for the corresponding tracked Pixel Events to begin monitoring user activity on the webpage.

67.     Once the Pixel is created and added to the website, the website operator will assign access to the Pixel to specific people for management purposes,[46] as well as connect the Pixel to a Facebook Ad account.[47]

68.     After following these steps, a website operator can start harvesting information by Meta and its Pixel to intercept subscribers' communications with the website.

69.     Once the Pixel intercepts communications, it duplicates the information in that communication, generates a new HTTP Request containing the duplicated information, and sends the HTTP Request to Meta.

---

[44] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on April 21, 2024).

[45]     *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on April 21, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on April 21, 2024).

[46] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on April 21, 2024).

[47] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622277416185967 (last visited on April 21, 2024).

70. This occurs the moment the communication is *sent* to the Website, not after it is *received* by the Website.[48]

71. A Pixel cannot be placed on a website by a third-party without being given access by the site's owner. There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

72. When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[49]

73. A Facebook UID can be used, by anyone, to easily identify a Facebook user. Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel intercepts subscribers' communications, it sends duplicated the information to Meta, including the UID. This occurs by copying the c_user cookie and inserting it into the Request Header of the Pixel-generated HTTP Request.

74. The UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

---

[48] The information is intercepted on users' browsers, which cannot access the information after the message has left computer. Any information captured on the receiving end would need to occur through Meta's Conversion API, as discussed, *supra*, ¶53.
[49] *Privacy Center: Cookies Policy*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/privacy/policies/cookies/ (last visited on April 21, 2024).

2) **The Pixel as a Tracking Method**

75.    The Pixel tracks user-activity on web pages by monitoring events which,[50] when triggered, causes the Pixel to automatically send data directly to Facebook.[51]

76.    Examples of events utilized by websites are: a user loading a page with (i) "microdata" tags (the "Microdata event"),[52] or (ii) with a Pixel installed (the "PageView event").[53]  The Website utilizes both events.[54]

77.    When a PageView and/or Microdata event is triggered, an HTTP Request is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[55]  This confirms that the Pixel events sent data to Facebook.

78.    The HTTP Request generated by the Pixel contains a Request URL, embedded cookies, parameters, and metadata, if any.

3) **The Pixel Shares Users' PII and Video Watching Data**

79.    When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[56]

---

[50]    *Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on April 21, 2024).

[51] *See generally Id.*

[52] Surya Mattu, et al., *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on April 21, 2024).

[53]    *Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited on April 21, 2024).

[54] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See Business Help Center: About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on April 21, 2024).

[55] *How We Built a Meta Pixel Inspector*, THE MARKUP, https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on April 21, 2024).

[56]    *Meta for Developers: Conversion Tracking*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited on April 21, 2024).

80.    The parameters for a Request URL, for instance, may include the title of a video being watched or the URL of the video, as depicted below:



*Figure 2 - PageView event firing, including video title and URL of video as parameters of Request URL*[57]

81.    Descriptive URLs on websites and parameters sent through the Pixel are optional and are used at the discretion of website developers such as ANI.

82.    The parameters sent through Pixel activations, as depicted in *Figure 7*, are *optional* data elements added by ANI to provide additional data about user activity on the Website.[58]

83.    While SubscribedButtonClick events can send data through the parameters, they often also send data through microdata or metadata tags.

84.    The presence of microdata tags is optional, and such SubscribedButtonClick data tags were chosen to be used by Defendant.[59]

---

[57] *Stuckey Honored With a Green Jacket Award of Excellence*, MASTERS (Apr. 14, 2024), https://www.masters.com/en_US/watch/2024-04-14/17131526793107937/stuckey_honored_with_green_jacket_award_of_excellence.html (last visited on Apr. 21, 2024).

[58] "Parameters are optional . . . objects that you can include when tracking standard and custom [Pixel] events. They allow you to provide additional information about your website visitors' actions." *Meta for Developers: Conversion Tracking*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited April 21, 2024).

[59] "Microdata is . . . used to nest metadata within existing content on webpages . . . You can use microdata tags on your website to provide information about your products . . . ." *Meta for Developers: Microdata Tags*, FACEBOOK, https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited April 21, 2024).

85.     Defendant here used the metadata to improve the ability of Website visitors to find or "discover" video content.[60]

86.     The SubscribedButton Click Pixel Event triggers whenever a Subscriber clicks on specific web elements pre-determined by the website developer, causing the Pixel to gather relevant information from the clicked web element, including microdata and metadata tags, and send that information to Meta.

87.     Microdata tags allow developers to nest metadata within the contents of a web page.[61]

88.     This metadata may include the title, summary, or description of a video – for example, here, under the "pageFeatures" tag, the Pixel collects "title": "Scottie Scheffler" – after clicking on a button to see content about the golfer Scottie Scheffler on the Website, as depicted below:



*Figure 3 - SubscribedButtonClick Event sends Microdata tag for video's title to Facebook[62]*

---

[60] *See, supra,* Section D, ¶¶ 47-50.
[61] *Meta for Developers: Microdata Tags,* FACEBOOK, https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on April 21, 2024).
[62] *Videos:    Scottie    Scheffler,    Round    4,* MASTERS, https://www.masters.com/en_US/players/player_46046.html?promo=minilb (last visited April 21, 2024).

89.    When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the microdata tags, as depicted in the developer's console above.

90.    After being routed to Player pages on the Website, such as Scottie Scheffler's, video is immediately displayed to subscribers, and begins playing automatically, containing highlights of the golfer's performance at each hole of a specific round, as depicted below:



*Figure 4 - Profile page for Scottie Scheffler includes prerecorded video highlight reel of golfer's performance at most recent Master's tournament, which plays automatically*[63]

91.    When a "c_user" cookie is in place, both the SubscribedButtonClick and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request Header, as depicted below:

---

[63] In addition, the URL appears to include a player identifier number, further identifying the player as the subject of the video content present on the page. *Videos: Scottie Scheffler, Round 4*, MASTERS, https://www.masters.com/en_US/players/player_46046.html?promo=minilb (last visited April 21, 2024).

*Figure 5 - Embedded c_user cookie in Pixel Request transmitted to Facebook[64]*

92.    Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of a user's website interactions (including Video Watching Data) and UID with Facebook.

93.    Thus, PII and Video Watching Data of subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook as a result of Team's decision to add the Pixel to the Website.

**F.    Defendant Offers Two Subscription Methods to the Website**

94.    A user can become a Subscriber to the Website as an Account Subscriber, a Newsletter Subscriber, or both.

95.    Defendant offers users the option to subscribe by creating an account that provides subscribers with access to exclusive video content including pre-recorded highlights, news stories, interviews, and video highlights generated based on their selected favorite golfers, along with other golf related video content.

---

[64]    *Stuckey Honored With a Green Jacket Award of Excellence*, Masters (Apr. 14, 2024), https://www.masters.com/en_US/watch/2024-04-14/17131526793107937/stuckey_honored_with_green_jacket_award_of_excellence.html (last visited on Apr. 21, 2024).

96.     Account Subscribers are offered access to the Website's Video Vault, which contains hundreds of exclusive pre-recorded videos only accessible to Account Subscribers.[65]

97.     In addition to the video content, Account Subscribers can pause and resume video content.  These are video enhancement features exclusive to Account Subscribers.  Defendant allows users to become Account Subscribers to access exclusive video content and video enhancement features not available to non-subscribers.

98.     Defendant presents the Account Subscription sign-up through the Website as shown in *Figure 6* below:



*Figure 6 - Showing the Account Subscriber sign-up on the Masters' Website*

99.     Defendant also offers users the ability to become a Newsletter Subscriber in exchange for providing their name, email address, and zip code to receive email. The Website provides Newsletter Subscribers with "featured content and highlights from the past 24 hours

---

[65] *Masters Vault*, MASTERS, https://www.masters.com/vault  (last visited April 21, 2024). *Masters Vault*, MASTERS, https://www.masters.com/vault  (last visited April 21, 2024).

directly to [their] email inbox, while also helping [them] plan your viewing schedule for the day that lies ahead."[66] Through their Newsletter, Defendant also states that they "will provide [subscribers] with the first notification of special offers, exclusive digital experiences and notify you of future fan opportunities."[67] Newsletter Subscribers are similarly able to access a live stream of the Masters Tournament, along with highlights, interviews, and other pre-recorded video content.

100.    Prospective Newsletter Subscribers are presented with the following webpage, depicted in *Figure 7*:

---

[66] *Newsletter*, MASTERS, https://www.masters.com/en_US/newsletter/index.html (last visited April 21, 2024).
[67] *Id*.



*Figure 7 - Showing the Subscription Page for ANI's newsletter*

101.    Defendant has utilized and continues to utilize the Pixel which allows Defendant to transmit Subscriber's Personal Viewing Information, without the consent of the Subscribers, from the Website to Facebook.

102.    Notably, all Subscribers – whether Account Subscriber or Newsletter Subscriber – who view streaming content on the Website are not provided with any notification that their Personal Viewing Information is being, or will be, shared.

103.    Defendant fails to obtain subscribers' written consent to collect and disclose their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

25

**G.**   **Subscriptions to Newsletters are Subscriptions to the Website**

104.   Upon information and belief, ANI does not offer standalone newsletter services. By all accounts, a Newsletter Subscription is a subscription to the Website itself or, at a minimum, the newsletter is a gateway to the Website or Masters App.

105.   ANI admits the purpose of their newsletter is to: a) during tournaments, "deliver featured content and highlights from the past 24 hours" and plan "viewing schedule[s] for the day that lies ahead[;]" and, b) outside tournaments, to provide subscribers with "the first notification of special offers, exclusive digital experiences and notify you of the future fan opportunities."[68] Importantly, ANI does not claim any of these benefits occur within the newsletter, but rather that the newsletter gives subscribers access to these benefits through the Website or Masters App.

106.   This conclusion is reinforced when signing up for the Website newsletter. Small text on the bottom of the page purports to alert Newsletter Subscribers that their "information is handled in accordance with the [ANI] Privacy Statement."[69] However, the Privacy Statement specifically "outlines the types of information that [ANI] gathers about [subscribers] while [subscribers] are using Masters.com, other websites controlled or managed by ANI . . . as well as our mobile apps . . . ."[70]

107.   By subscribing to the newsletters, Newsletter Subscribers are effectively subscribing to the Website.

**H.**   **E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between ANI and Subscribers**

---

[68] *Newsletter*, MASTERS, https://www.masters.com/en_US/newsletter/index.html (last visited April 21, 2024).
[69] *Id.*
[70]       https://www.masters.com/en_US/info/privacy/index.html          *Privacy     Statement*,     MASTERS, https://www.masters.com/en_US/info/privacy/index.html (last visited April 21, 2024).

108.    ANI benefits from the value created through its use of free e-newsletters and its subscription-based service model.

109.    E-newsletters are an important and effective business tool. In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture leads.[71]  Additionally, visitors who reach web pages through e-mails, such as e-newsletters, view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred to web pages from Facebook.[72] Web page visits stemming from e-mails are also more engaged than those from any other platform.[73] ANI, through its interplay between it free newsletters and increasing traffic to its website, recognized and utilized this business tool.

110.    E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself.[74] The Website's newsletter effectively served to provide this value.

111.    Finally, newsletters also help ANI obtain additional information about users, such as their names, email addresses, physical addresses, birthdays, and interests.

---

[71] *What is an Email Newsletter?*, CAMPAIGN MONITOR, https://www.campaignmonitor.com/resources/knowledge-base/what-is-an-email-newsletter/ (last visited on April 21, 2024).

[72] *Content Monetization: Driving Revenue with Email Newsletters*, UPLAND, https://uplandsoftware.com/postup/resources/blog/content-monetization-email-newsletters/ (last visited on April 21, 2024).

[73] *Id.*

[74] *8 Ways to Monetize Email Newsletters for Publishers*, SAILTHRU, https://www.sailthru.com/marketing-blog/8-ways-monetize-email-newsletters-publishers/ (last visited on April 21, 2024) (adding that e-newsletters can serve as a means to hook consumers to more frequently subscribe to a paid subscriptions with the company by providing users a taste of what the site's paid content may offer).

I.       **Sign-up for the Defendant's Subscriptions Lack Informed, Written Consent**

112.     The Website does not seek nor obtain permission from their subscribers, including Plaintiffs, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

113.     The sign-up processes for the Website's newsletters do not seek nor obtain informed, written consent.

114.     To the extent information about any of the Website's data sharing is ostensibly available, the language (i) is not presented to users of the site in a transparent manner; (ii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iii) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

115.     The Website includes a newsletter sign-up, which appears as:[75]

---

[75]     *Your       Guide       to       the       upcoming       Masters       tournament*, MASTERS, https://www.masters.com/en_US/newsletter/index.html (last visited on April 21, 2024).

## Your Guide to the upcoming Masters Tournament

You're officially invited to join the Masters Newsletter - a daily and seasonal guide to the Masters Tournament.

During the Tournament, the Masters Newsletter will deliver featured content and highlights from the past 24 hours directly to your email inbox, while also helping you plan your viewing schedule for the day that lies ahead.

Outside the Tournament, the Masters Newsletter will provide you with the first notification of special offers, exclusive digital experiences and notify you of future fan opportunities.

Complete the form below to subscribe.



First Name

Last Name

Email Address* - required

Zip Code

By submitting this form you agree that you would like to receive news and information regarding the Masters Tournament via email. Your information is handled in accordance with the Augusta National Privacy Statement. You can unsubscribe from the Masters Newsletter at any time by clicking "Unsubscribe" on the bottom of our email newsletter.

Subscribe

*Figure 88 - Sign up for newsletter as it appeared on April 2, 2023*



*Figure 99 - Newsletter Signup Form after it was amended on April 11, 2023[76]*

---

**J.** **Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' PII and Video Watching Data**

116.    The VPPA sets out guidelines as to the forms of consent that consumers can give to video tape service providers to share consumers' information.

117.    The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[77]

118.    Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[78]

119.    While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[79]

120.    Here, Defendant's use of the Pixel *does* cause the disclosure of the title, description, or subject matter of the audio-visual material.

121.    Plaintiffs and Class Members did not consent to Defendant's Pixel pursuant to the VPPA, as Plaintiffs were not asked to provide informed, written consent in a form separate from other legal or financial obligations.

122.    Additionally, Plaintiffs and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

---

[77] 18 U.S.C. § 2710(b)(2)(B); 18 U.S.C. § 2710(b)(2)(B)(i).
[78] 18 U.S.C. § 2710(b)(2)(B)(ii); 18 U.S.C. § 2710(b)(2)(B)(iii).
[79] 18 U.S.C. § 2710(b)(2)(D).

123.    Finally, Defendant included titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiffs' and Class Members' PII.

**K.    ANI Uses the Information Collected Through Its Tracking Tools, Including the Pixel, to Build and Sell Access to Profiles of Subscribers**

124.    The market value of user data collected by Defendant depends on the quantity of users that data represents, and nature of the activities monitored when collecting that data.

125.    As described above in Section D, video services are a significant component of Defendant's overall business.

126.    The hosting and presentment of videos generates more traffic and represents a "more lucrative" venture than non-video content; indeed, video advertising "warrant higher rates than other online ads."[80]

127.    As a result, media outlets report that they aim to create and publish "a couple hundred videos a day" with a hope to "be doing 2,000 videos a day."[81]

128.    The advertisements on those videos, however, only have value to advertisers if they can reach a broad audience that is interested in the advertisers' products or services.

129.    These economics incentivize video providers to make the videos easy to access for users and to gather as much information on users as possible to target them effectively. As users revisit the website, they provide more information on their interests to the website.

130.    Thus, the Website seeks to provide widely available content to subscribers, by enticing subscribers to return to the Website as often as possible, building a more in-depth profile of each user with each passing visit.

---

[80] John Herrman, *As Online Video Surges, Publishers Turn to Automation*, THE NEW YORK TIMES (Jul. 10, 2016) https://www.nytimes.com/2016/07/11/business/media/as-online-video-surges-publishers-turn-to-automation.html (last visited April 21, 2024).
[81] *Id.*

131.    As discussed above in Section E, ANI makes use of, at a minimum, tracking tools developed by Meta.

132.    ANI collects the data it receives from its tracking tools, including the Pixel, and together with Meta, builds comprehensive profiles of subscribers, which uses VPPA-protected PII, to advertise to Website subscribers.[82]

133.    Defendant cannot plead ignorance as to the scope of the data it collects, its various sources, or the purpose of such data collection.

## CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action individually and on behalf of the following Class:

All Subscribers to the Website that had their video watching activities improperly disclosed to Facebook through the use of the Pixel.

135.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

136.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

137.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

---

[82] "We may use personally identifiable information to market to you . . . including via direct marketing, and/or by delivering targeted and interest-based advertising" *Privacy Statement*, MASTERS, https://www.masters.com/en_US/info/privacy/index.html (last visited April 21, 2024).

138.    <u>Numerosity (Rule 23(a)(1))</u>: At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

139.    <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiffs' claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, a Website to watch videos, and had their PII collected and disclosed by Defendant.

140.    <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class.   Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

141.    <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

142.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

1) Whether Defendant collected Plaintiffs' and the Class's PII and Video Watching Data;

2) Whether Defendant unlawfully disclosed and continues to disclose the PII and Video Watching Data of Subscribers of the Website in violation of the VPPA;

3) Whether Defendant' disclosures were committed knowingly; and

4) Whether Defendant disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

143. Information concerning Defendant's Website data sharing practices and subscription members is available from Defendant's or third-party records.

144. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

145. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

146. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

147. Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

148.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in paragraphs 1 through 133 as though fully set forth herein.

149.   Plaintiffs bring this count on behalf of himself and all members of the Class.

150.   The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

151.   Defendant violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

152.   Defendant, through the Website, engages in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users.  The Website delivers videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Website.

153.   "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

154.   A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

155.    Defendant is a "video tape service provider" because it creates, hosts, and delivers hundreds of videos on its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

156.    Defendant solicits individuals to subscribe to the Website newsletters that advertise and promote videos and articles on the Website.

157.    Plaintiffs and members of the Class are "consumers" because they subscribed to the Team newsletters. 18 U.S.C. § 2710(a)(1).

158.    Plaintiffs and the Class members viewed video clips using the Website.

159.    Defendant disclosed Plaintiffs' and the Class members' personally identifiable information to Facebook. Defendant utilized the Pixel which forced Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

160.    Defendant knowingly disclosed Plaintiffs' PII, which is triggered automatically through Defendant's use of the Pixel.  No additional steps on the part of the Defendant, Facebook, or any third-party are required.  And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (*e.g.,* www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

161.    The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed

written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

162.    Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties. Defendant failed to obtain "informed, written consent" from subscribers – including Plaintiffs and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

163.    Defendant's disclosure of Plaintiffs' and Class Members' PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

164.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

165.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18

U.S.C. § 2710(c) as to Defendant; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**Injunctive Relief of Defendants' Ongoing VPPA Violations**

166.    An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative class they seek to represent, and Defendant, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendant has violated, and continue to violate, Plaintiffs' rights to protection of their PII under the VPPA.

167.    Plaintiffs demonstrated that they are likely to succeed on the merits of their claims, and are thus, entitled to declaratory and injunctive relief.

168.    Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA by Defendant. Unless enjoined by the Court, Defendant will continue to infringe on the privacy rights of Plaintiffs and the absent class members and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

169.    Defendant disregards its obligation under the VPPA by installing the tracking methods, including the Pixel, onto the Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

170.    Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA, Defendant did not seek or obtain any form of consent from subscribers for the use of the tracking methods to share information improperly obtained from the Website.

171.    This threat of injury to Plaintiffs from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure without adequate notice and consent.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)    For an order declaring that the Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Pixel from the Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For Defendant to pay $2,500.00 to Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)    For pre-judgment interest on all amounts awarded;

(i)    For an order of restitution and all other forms of monetary relief;

(j)    An award of all reasonable attorneys' fees and costs; and

(k)    Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 22, 2024

**LEVI & KORSINSKY, LLP**

By: _/s/ Mark S. Reich_
Mark S. Reich (MR-4166)
Gary I. Ishimoto*
Colin A. Brown*
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: cbrown@zlk.com

_Counsel for Plaintiffs_

_*pro hac vice_ forthcoming